JAMES M. SMART, JR., Judge.
 

 Abdul Moheet, M.D., appeals the decision of the Administrative Hearing Commission in which it found cause to discipline his medical license by subjecting it to a public reprimand. We affirm the Commission’s decision.
 

 Factual and Procedural Background
 

 Appellant Abdul Moheet, M.D., was licensed by the State Board of Registration for the Healing Arts as a physician and surgeon in 1986. In January 2001, the Board filed a complaint with the Administrative Hearing Commission seeking a determination that Dr. Moheet’s physician license was subject to discipline. The complaint arose out of Dr. Moheet’s emergency-room treatment of a patient, referred to as “J.D.,” in January 1995.
 

 First Emergency Room Visit
 

 On January 20, 1995, J.D., a forty-year-old male suffering from high blood pressure, felt a sudden and severe headache while driving. Soon after he returned home, he asked his son, Jason, to call an ambulance. When the paramedics arrived, they took J.D.’s history, which included hypertension (high blood pressure), and a list of J.D.’s medications, one of which was to treat the hypertension. They noted that J.D.’s chief complaints were a headache and neck spasms. Jason notified his mother, J.D.’s wife, at her work.
 

 Because of J.D.’s neck pain, the paramedics put a cervical collar on him and secured him to a spinal board. They took his blood pressure three times between 3:59 and 4:30 p.m. and gave him nitroglycerine to lower his blood pressure. His blood pressure was high, ranging from 200/120 to 170/130. After delivering J.D. to the emergency room, the paramedics remained there for about fifty minutes. They gave a verbal report to an unidentified nurse. It is unclear what happened to their written report at this point.
 

 The nurse manager of the emergency department, Douglas Bouldin, R.N., was waiting to perform triage on J.D. when he arrived. Bouldin filled in an Emergency Room Record form (the “E.R. form”) with J.D.’s vital signs. J.D.’s blood pressure was 170/130 at 4:50 p.m. Bouldin also recorded J.D.’s medications. He wrote on the form, “Cervical neck pain & [headache].” Bouldin passed the E.R. form to the nurse assigned to J.D.’s room, Darlene Brooks.
 

 J.D.’s wife gave Nurse Brooks J.D.’s medical history, which in addition to high blood pressure, included depression, alcoholism, and left arm numbness. She also told the nurse that J.D. had not been taking his blood pressure medicine. Brooks examined and questioned J.D. and wrote her findings on the E.R. form. J.D. told her that while driving, he had a “charlie horse,” causing a severe headache. He could not hold his head up without pain and could not turn his head. He also complained of pain and numbness around his left wrist and elbow. Brooks did not take J.D.’s blood pressure.
 

 Dr. Moheet was on duty in the emergency room that day. At 5:05 p.m., Dr. Mo-heet began examining and taking a history from J.D. He observed that J.D. was
 
 *382
 
 lying on a backboard in a cervical collar, holding onto the side rails of the gurney, clenching his teeth, and going into spasms. When asked why he was in the emergency room, J.D. responded that he was having neck pain that radiated into the back part of his head. Dr. Moheet asked J.D. if he had hurt himself, and he said that he fell while sledding in the snow (referring to an incident the previous day when sledding with his children). He complained of numbness in the left arm. Dr. Moheet was hampered in taking J.D.’s medical history because J.D. was unhappy with the questions and repeatedly requested pain medication.
 

 Dr. Moheet checked J.D.’s breathing, pulse, lung sounds, and abdomen. He then did a neurological check, which included checking his ability to feel sensations. J.D. had decreased sensation in the thumb, outer forearm, middle finger, and on the inner side of the left hand. To Dr. Moheet, these sensory changes suggested radiculopathy (nerve impingement due to a cervical disc problem). J.D. was given an injection for pain. Dr. Moheet sent J.D. for x-rays. Although J.D. had informed the nurse of a sudden onset of head pain, Dr. Moheet did not order a CAT scan of the head. J.D.’s reflexes were normal. When it was determined that J.D. did not have a neck fracture, the collar, cushion, and backboard were removed, and he was returned to the emergency room.
 

 At 6:40 p.m., Dr. Moheet again examined J.D. and checked his neurological responses. At this time, J.D., who was sitting up on the gurney, told Dr. Moheet that he was feeling
 
 50%
 
 better. Dr. Mo-heet told J.D. of his diagnosis of a C-6 radiculopathy (pinched sixth nerve) on the left side. He told J.D. that the x-ray was negative and that he was being discharged with a muscle relaxant and an anti-inflammatory painkiller. J.D.’s wife asked whether those medications would cause a problem with J.D.’s blood pressure. Dr. Moheet said they would not. Dr. Moheet did not consider this mention of blood pressure to be a reason to further examine J.D. He testified at the hearing that the primary care physician handles blood pressure maintenance and most cases do not become emergency room situations. At 7:00 p.m., J.D. was given a soft collar for his neck and released to go home.
 

 Dr. Moheet later charted his findings for J.D. based on his notes. Dr. Moheet did not know J.D.’s blood pressure when he treated him and did not review the ambulance records or the E.R. form. Dr. Mo-heet expected his nurses to inform him of any abnormalities in the patient’s vital signs. J.D. did not inform Dr. Moheet that he had high blood pressure nor did he mention that he had stopped taking his medication.
 

 Second Emergency Room Visit
 

 At approximately 6:30 the next morning, J.D.’s wife found J.D. unconscious on the bedroom floor and could not revive him. An ambulance crew responded and took J.D.’s blood pressure four times between 7:16 and 7:50 a.m. The readings were extremely high: 220/120; 200/128; 210/118; and 228/108. The ambulance crew gave J.D. a drug for hypertension and took him to the hospital.
 

 At the hospital, Dr. Michael F. Boland, a neurosurgeon, was informed by emergency room personnel that J.D. had an abnormal CAT scan, was comatose, and needed emergency neuro-surgical treatment. Dr. Boland diagnosed a spontaneous intraven-tricular hemorrhage in the fourth ventricle of his brain (a hemorrhagic stroke). The blood from the hemorrhage had clotted and blocked the flow of spinal fluid. The excess fluid in his brain built up tremendous pressure, causing him to lapse into a coma. Dr. Boland believed that J.D. had
 
 *383
 
 suffered the hemorrhage during the afternoon of January 20, 1995, and that he would have stopped bleeding by the time he arrived at the emergency room that previous day.
 

 Dr. Boland told J.D.’s wife that J.D. needed an emergency procedure to avoid imminent death. His wife authorized the procedure. The procedure was performed in the emergency department due to the urgency. J.D. spent a week in neuro-intensive care, a week in a step-down area, and a week on a rehabilitation floor. At the time of the hearing, J.D. was deceased, having died the previous March. There is no evidence that the cause of his death (an intra-abdominal hemorrhage) was related to the 1995 stroke.
 

 Hemorrhagic Stroke
 

 According to Dr. Boland, intraventricu-lar hemorrhages of the brain are relatively rare, and most symptoms are not evident until the bleeding has been going on for a period of hours. The patient often has a headache and neck pain. The blood pressure can be elevated or remain normal. However, complaints of a headache with neck pain but without a stiff neck, nausea, and vomiting, is not a typical presentation. Unlike other types of strokes, the patient may show no neurological deficit because there is no destruction of brain tissue. According to Dr. Boland, a CAT scan on January 20th would have revealed the hemorrhage in J.D.’s brain.
 

 Proceedings Before the Commission and the Circuit Court
 

 In January 2001, the Board filed its complaint against Dr. Moheet. The complaint alleged,
 
 inter alia,
 
 that cause exists to discipline Dr. Moheet’s license pursuant to section 384.100.2(5), RSMo. 2000,
 
 [1]
 
 which allows the Board to file a complaint for the following cause:
 

 Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient ...; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties of any profession licensed or regulated by this chapter.
 

 After a hearing, the Commission found cause to discipline Dr. Moheet’s license based on “gross negligence” and “conduct that might have been harmful or dangerous to the physical health of a patient.” The Board thereafter issued a public reprimand to Dr. Moheet’s license.
 

 On judicial review, the Cole County Circuit Court affirmed the Commission’s findings of facts and conclusions of law and the disciplinary order. Dr. Moheet now appeals to this court.
 

 Standard of Review
 

 On appeal, we review the Commission’s decision, rather than that of the trial court.
 
 State Bd. of Registration for Healing Arts v. McDonagh,
 
 123 S.W.3d 146, 152 (Mo. banc 2003). For purposes of review, the Commission’s action and the Board’s order are “treated as one decision.”
 
 Dorman v. State Bd. of Registration for Healing Arts,
 
 62 S.W.3d 446, 453 (Mo.App.2001)
 
 (citing
 
 § 621.145). The decision is presumed valid, and the attacking party has the burden of overcoming that presumption.
 
 Id.
 
 This court will affirm the decision and order unless it:
 

 (1) Is in violation of constitutional provisions;
 

 (2) Is in excess of the statutory authority or jurisdiction of the agency;
 

 
 *384
 
 (3) Is unsupported by competent and substantial evidence upon the whole record;
 

 (4) Is, for
 
 any other reason, unauthorized by law;
 

 (5) Is made upon unlawful procedure or without a fair trial;
 

 (6) Is arbitrary, capricious or unreasonable;
 

 (7) Involves an abuse of discretion.
 

 § 536.140.2. We will not substitute our judgment for that of the Commission on factual matters, but questions of law are matters for the independent judgment of this court.
 
 McDonagh,
 
 123 S.W.3d at 152.
 

 Lack of Notice as to All Charges
 

 In his first point on appeal, the Appellant alleges that the Commission’s decision violated subsections 1, 2, 4, and 5 of section 536.140.2 because the complaint failed to give adequate notice of all the charges against him. He says that it failed to allege: (1) that the Board was seeking discipline based on “any conduct or practice which is or might be harmful to the mental or physical health of a patient” and (2) that Dr. Moheet failed to obtain an adequate history of the patient, both of which the Commission found to be grounds for discipline. According to Dr. Moheet, the pleadings indicated he was being accused only of “gross negligence” and “incompetence.” He alleges he was, therefore, unprepared to defend himself on these other charges at the hearing, resulting in severe prejudice to him.
 

 As noted, section 334.100.2(5) authorizes the Board to file a complaint for “any conduct or practice which is or might be harmful or dangerous to the ... physical health of a patient ...; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties” of his profession. State regulation 1 CSR 15-3.350(2)(A) requires an agency’s complaint to set forth “[a]ny conduct that a licensee has committed that is cause for discipline, with sufficient specificity to enable the licensee to defend against the charge at hearing; and any provision of law that allows discipline for such acts.” The purpose of the complaint is to inform the licensee of the allegations with which he is charged and to provide sufficient notice to enable him to prepare an adequate defense.
 
 Duncan v. Mo. Bd. for Architects, Prof'l Eng’rs & Land Surveyors,
 
 744 S.W.2d 524, 538-39 (Mo.App.1988).
 
 Duncan
 
 sets forth the level of pleading required:
 

 The specificity of charges could be at essentially three levels. The most general is simply a statement that the accused has violated one or more of the statutory grounds for discipline without further elaboration, i.e., he has been grossly negligent. Such an allegation is insufficient to allow preparation of a viable defense.
 
 The second level involves a greater specificity in setting forth the course of conduct deemed to establish the statutory ground for discipline.
 
 The third level involves a degree of specificity setting forth each specific individual act or omission comprising the course of conduct.
 
 Due process requires no more than compliance with the second level.
 

 Id.
 
 at 539. (Emphasis added.) A finding that the licensee is guilty of a charge that does not appear in the complaint cannot stand.
 
 Id.
 

 The pertinent parts of the Board’s complaint alleged:
 

 13. While J.D. was in the emergency room the day before the admission, licensee knew or should have known that J.D.’s blood pressure was very high.
 

 14. Failure to ascertain a patient’s vital signs, including blood pressure, in the practice of emergency medicine is below the standard of care.
 

 
 *385
 
 15. Licensee’s failure to assess J.D.’s blood pressure in the emergency room constitutes gross negligence.
 

 16. Because of licensee’s failure to assess J.D.’s blood pressure in the emergency room, J.D. was deprived of timely diagnosis and treatment of the bleed, reducing the likelihood of a favorable clinical outcome.
 

 17. While J.D. was in the emergency room the day before the admission, licensee failed to do a complete physical examination of the patient.
 

 18. While J.D. was in the emergency room the day before the admission, licensee failed to obtain appropriate laboratory tests.
 

 19. Licensee’s failure to adequately assess, diagnose and treat J.D. when he presented in the emergency room was below the standard of care for an emergency department physician.
 

 20. Licensee’s conduct, as set forth herein, constitutes incompetency and gross negligence in the practice of medicine.
 

 21. Cause exists to discipline Respondent’s license pursuant to § 334.100.2(5), RSMo. Supp.1998, which provides, in pertinent part:
 

 2. The board may cause a complaint to be filed with the administrative hearing commission ... against any holder of any ... license required by this chapter ... for any one or any combination of the following causes:
 

 [[Image here]]
 

 (5) Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties of any profession licensed or regulated by this chapter. For the purposes of this subdivision, “repeated negligence” means the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar* circumstances by [a] member of the ... profession^]
 

 In finding cause to discipline, the Commission stated:
 

 We find cause to discipline Moheet’s license under section 334.100.2(5) for
 
 gross negligence
 
 and
 
 conduct that might have been harmful or dangerous to the 'physical health of a patient,
 
 in that he diagnosed, treated and discharged J.D. without knowing an important vital sign, his blood pressure, and for failing to obtain an adequate patient history. (Emphasis added.)
 

 The Commission found Dr. Moheet “grossly negligent” because he “assessed, treated and discharged J.D. without knowing his blood pressure” and because he “did not actively seek out the information about the blood pressure and medical history which might have led him to the correct diagnosis.”
 

 Dr. Moheet presented his objections about the complaint in his written argument to the Commission. The Commission rejected the argument. It held that the complaint was sufficient to meet the
 
 Duncan
 
 standard with regard to the factual allegations. The Commission also held that the complaint gave Dr. Moheet notice that negligence was going to be an issue by stating that his conduct “was below the standard of care for an emergency department physician.” The Commission noted that the Board could have provided more specific notice of discipline for conduct that is harmful or dangerous to the patient. However, the Commission concluded that “the recitation of the statute, in combination with the reference in [Paragraph] 16 stating the J.D. ‘was deprived of timely diagnosis and treatment of the bleed, reducing the likelihood of a favorable out
 
 *386
 
 come,’ provided Dr. Moheet with sufficient notice that he might be subject to discipline for conduct that was harmful to a patient.”
 

 1. Conduct which is or might be harmful to a patient.
 

 Dr. Moheet contends that the allegation of “conduct or practice which is or might be harmful or dangerous to the ... physical health of a patient” was never pleaded, and, contrary to the Commission’s findings, was not reasonably inferable from the complaint. He claims ■ he was denied due process because he had no notice that he should be prepared to refute that allegation. Dr. Moheet says this lack of notice denied him the chance to adequately cross-examine the Board’s expert or to prepare his own expert to testify with regard to this allegation.
 

 The Commission based its ruling in this matter primarily on Paragraphs 16 and 21. Paragraph 21 sets out in full the provisions of section 334.100.2(5), including the language allowing discipline for “conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public.” The Commission found that “the recitation of the statute, in combination with the reference in [Paragraph] 16 stating that J.D. ‘was deprived of timely diagnosis and treatment of the bleed, reducing the likelihood of a favorable outcome,’ ” provided sufficient notice that Dr. Moheet might be subject to discipline for conduct that was harmful to a patient.
 

 Although a bare recitation of the statute,
 
 without factual support,
 
 is insufficient to satisfy due process,
 
 see Mo. Dental Board v. Cohen,
 
 867 S.W.2d 295, 296-97 (Mo.App.1993), here there
 
 was
 
 factual support for the allegation of harmful or dangerous conduct. The complaint stated that Dr. Moheet diagnosed and treated J.D. for neck pain, when in fact J.D. suffered an intra-cranial hemorrhage. The complaint also states that J.D. presented in the emergency room with an elevated blood pressure; that Dr. Moheet never ascertained J.D.’s vital signs, including his blood pressure; and that Dr. Moheet’s failure to ascertain the blood pressure fell below the standard of care. Paragraph 16 states, “Because of Licensee’s
 
 failure to assess
 
 J.D.’s blood pressure in the emergency room, J.D. was
 
 deprived of timely diagnosis and treatment
 
 of the bleed, reducing the likelihood of a favorable outcome.”
 

 Dr. Moheet states that the unpleaded allegation of “conduct that might have been harmful” refers to conduct that is
 
 “lesser
 
 in kind or degree than even ordinary negligence” and is a “broader ground of misconduct” than the gross negligence with which he was charged. He argues that he was, therefore, unprepared to defend against it. We disagree. Dr. Moheet had notice that he was subject to discipline for failure to properly and timely assess, diagnose, and treat the intra-cranial bleeding, with the result that the patient suffered a reduction in the likelihood of a favorable outcome. The conduct “was encompassed in the allegations in the complaint.”
 
 Duncan,
 
 744 S.W.2d at 539. Thus, the pleadings conform to both the
 
 Duncan
 
 standard and the State regulation.
 

 Dr. Moheet’s own pleading also showed that he knew what he was defending against. Dr. Moheet pleaded as an affirmative defense to the petition, and argued at trial, that any harm J.D. may have suffered was the result of J.D.’s own conduct for failing to give a “full, accurate and complete history” of his medical condition. Thus, Dr. Moheet was fully aware of the link between the failure to obtain an adequate medical history and the possibility of harm to the patient. He was well aware that he would need to defend against the
 
 *387
 
 notion that his failure to properly assess the patient’s condition was detrimental to the welfare of the patient and created a danger for the patient.
 

 The Commission did not err in finding that Dr. Moheet’s license should be subject to discipline on this ground. The ground was sufficiently pleaded, and Dr. Moheet had adequate notice of the charges against him. Point denied.
 

 2. Failure to obtain an adequate patient history.
 

 Second, Dr. Moheet contends that the Commission erred in basing its decision on a finding of failure to obtain an adequate patient history because that was not pleaded. He says the complaint alleged only that the Commission should find cause to discipline for incompetence and gross negligence for failing to (1) ascertain or obtain J.D.’s blood pressure, (2) do a complete physical examination, (3) obtain appropriate laboratory tests, and (4) adequately assess, diagnose, and treat J.D.
 

 The Commission found that “[t]he failure to ascertain and assess information about a patient in order to adequately prepare a patient history ... falls below the standard of care for an emergency room doctor” and “constitutes gross negligence and conduct that would be likely to cause harm to a patient.” The Commission finding of a failure to ascertain and assess information about the patient would seem to be encompassed in the complaint’s assertion that he failed to “adequately assess, diagnose, and treat J.D.”
 

 Here the Commission’s finding was not only “fully supported by the evidence,” but it also was “contained in the complaint.”
 
 Cf. Duncan,
 
 744 S.W.2d at 539 (finding, although supported by the evidence, could not stand where it was not pleaded,
 
 even by inference).
 
 Here, the allegations of failure to ascertain the vital signs and failure to assess the patient’s condition were not only supported by the evidence, but were pleaded in the complaint in plain terms. The complaint alleged that “[a]t the time J.D. presented in the emergency room, he had a history of hypertension.” It further alleged that Dr. Moheet failed to “adequately assess, diagnose, and treat J.D.” The ordinary understanding of the words “ascertain” and “assess” would denote obtaining and evaluating the facts pertinent to the patient, including, of course, patient history. Thus, this allegation, too, was encompassed in the complaint.
 
 See id.
 

 Dr. Moheet had sufficient notice of the allegation that he improperly failed to obtain an adequate patient history on J.D., and the Commission did not err in finding that the complaint was sufficient to meet the standards set forth in
 
 Duncan.
 
 Point denied.
 

 Insufficient Evidence to Support “Harmful or Dangerous Conduct” Finding
 

 In his second point, Dr. Moheet argues that there was no competent and substantial evidence to support the Commission’s finding of conduct that might have been harmful or dangerous to the patient. Dr. Moheet contends that the testimony the Commission relied on for that determination — that of the Board’s expert witness, Dr. David Tarlow — cannot constitute competent evidence, because it was wholly unsupported by any facts in evidence.
 

 A trial court has broad discretion regarding the admission of evidence, including expert testimony.
 
 Rigali v. Kensington Place Homeowners’ Ass’n,
 
 103 S.W.3d 839, 844 (Mo.App.2003). Expert testimony in a contested case administrative proceeding, such as this one, is governed by section 490.065.
 
 McDonagh,
 
 123
 
 *388
 
 S.W.3d at 155. That statute provides in part:
 

 3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.
 

 § 490.065.3. The facts on which an expert’s opinion is based must have a substantial basis in established facts.
 
 Heisler v. Jetco Serv.,
 
 849 S.W.2d 91, 95 (Mo.App.1993). The opinion cannot rest on mere conjecture, speculation, or assumption of facts.
 
 Rigali,
 
 103 S.W.3d at 845.
 

 Dr. Moheet focuses on Dr. Tarlow’s response to the question of whether there are conditions that can be diagnosed based on changes in the patients’ vital signs alone. The doctor answered in the affirmative, and painted several scenarios where this could occur. The Commission overruled Dr. Moheet’s objection to this testimony at trial,
 
 [2]
 
 stating that because Dr. Tarlow was an expert, he was subject to “different parameters ... when it comes to hypothetieals” like this one. We disagree with Moheet’s objections and we also disagree that this testimony was hypothetical. The testimony was being offered merely to illustrate an earlier point he had made that was specific to J.D.’s case. Dr. Tarlow first testified about the importance of obtaining a blood pressure reading for a patient with J.D.’s symptoms:
 

 Q. What was the importance of the blood pressure in an accurate diagnosis of this patient?
 

 A. Well, the blood pressure — a person with very high blood pressure and a headache has to conjure up a catastrophic medical condition of a blood — of bleeding in the head. The bleeding in the head then causes what’s called intra-cranial hypertension and causes the headache.
 

 He then was asked for examples of medical conditions that present with only changes in a patient’s vital signs. The list of situations provided by Dr. Tarlow was intended to emphasize his previous statement and to support his opinion that physicians have a duty of care to know their patients’ vital signs. He testified:
 

 [V]ital signs are vital. That’s why they call them vital signs ... and the standard of care would dictate that not only would you need to know the actual vital signs, the actual numbers, but you’d need to know them in trends, how they were before, maybe when they came in initially and maybe when they’re being discharged two hours later.
 

 Dr. Tarlow elaborated on the significance of vital signs:
 

 Q. Can a physician do a thorough physical exam without obtaining the vital signs of a patient?
 

 A. Absolutely not.
 

 Q. Was it important when the patient [J.D.] presented in the emergency room on the 20th of January 1995 for Dr. Moheet to have done a thorough physical exam, including vital signs?
 

 A. It was required, yes.
 

 Dr. Tarlow’s testimony, taken as a whole, constituted competent and substantial evidence to support the decision. The Commission also relied upon testimony from
 
 *389
 
 Dr. Moheet’s own expert, noting that “Mo-heet’s own witness stressed the importance of the blood pressure numbers.” The Commission cited the following quote from Dr. Christopher Brooks:
 

 Q: And do you typically when you’re treating patients, do you typically want to find out what the vital signs of the patient are?
 

 A: Yes, I do.
 

 Q: If those vital signs are not provided to you in terms of documentation or not readily available to you within some documents that may be in the emergency department, would you take them yourself?
 

 A: Not usually. I would actively seek them out [sic] and if they’re not available have a nurse or one of the medical students or residents working with me, make sure that the vital signs get taken.
 

 An expert is allowed to give opinions based on facts and data reasonably relied upon by experts in the field.
 
 McDonagh,
 
 123 S.W.3d at 156
 
 (citing
 
 § 490.065.3). Here, Dr. Tarlow’s opinions were based on his education and experience as a physician who is board certified in emergency medicine, and his testimony was based upon facts in evidence. The Commission did not err in relying on his testimony. That evidence, combined with the other evidence in the record, was sufficient to support the Commission’s finding of conduct that might be harmful to a patient. Point denied.
 

 Insufficient Evidence to Support “Gross Negligence”
 

 Finally, Dr. Moheet argues that the Commission erred in its finding of “gross negligence” because there was no competent and substantial evidence to support a finding of causation. Dr. Moheet claims there was no credible evidence that his actions actually caused any injury or damage. He contends that such a finding is a necessary element of gross negligence under the statute.
 

 Dr. Moheet cites Judge Wolffs separate opinion in
 
 McDonagh,
 
 123 S.W.3d at 164 (Wolff, J., concurring in part and dissenting in part), for the proposition that there can be no discipline in the absence of proof of actual harm caused to the patient by the alleged failure of the licensee. Dr. Moheet concludes from Judge Wolffs opinion that there is an absolute causation requirement for “gross negligence” under section 334.100.2(5) similar to the causation requirement in civil medical negligence actions. We disagree.
 

 First, we think that Dr. Moheet misconstrues Judge Wolffs opinion in
 
 McDonagh.
 
 Dr. Moheet implies that Judge Wolffs opinion means there must be “credible evidence that [the doctor’s] actions [actually] caused ... injury or damage” in order to find “gross negligence.” Dr. Moheet omits Judge Wolffs statement that in his mind, “the real question” was “whether acts of negligence ... can be cause for discipline if there is no showing that the physician’s conduct ‘is or might be harmful or dangerous.’ ”
 
 Id.
 
 In that case, Judge Wolff was asserting that there was no showing of any
 
 potential
 
 for harm from the prescribing of chelation therapy for vascular disease.
 
 [3]
 

 Id.
 
 at 164-65. Even if the majority in
 
 McDonagh
 
 had agreed with Judge Wolff, and it did not, the facts of that case would be distinguishable because here there was no real doubt that Dr. Moheet’s alleged gross negligence carried risk of substantial damage.
 

 
 *390
 
 License discipline cases are not intended to punish physicians for the results of their negligence, but are intended to protect the public.
 
 Duncan,
 
 744 S.W.2d at 531. The theory of Section 334.100.2(5) is that the public is best protected by ensuring that physicians seek to protect against professional failure that
 
 might
 
 result in harm to patients.
 

 It is unnecessary to address Dr. Mo-heet’s specific arguments under this point about lack of causation. There is ample evidence in the record to support a finding of “gross negligence.” The Commission, therefore, did not err in finding that Dr. Moheet’s license was subject to discipline on that ground. Point denied.
 

 Conclusion
 

 For the foregoing reasons, the judgment of the Commission is affirmed.
 

 ELLIS and HARDWICK, JJ., concur.
 

 [1]
 

 . All statutory references are to Revised Statutes of Missouri, 2000, unless otherwise noted.
 

 [2]
 

 . Dr. Moheet did not object on this exact basis at trial. There, he objected (1) that the testimony “seem[ed] to expand the pleadings because there’s no allegation here that that kind of scenario took place[,]” and (2) on the basis of ''relevance” and because it was "unresponsive” and "constituted a variety of volunteered information points.”
 

 [3]
 

 . The alleged negligent act in that case was the repeated prescribing of chelation therapy for vascular disease where such treatment was not approved by the FDA for that purpose.
 
 McDonagh,
 
 123 S.W.3d at 150-51.