Joan Ellis MARSCHKE,
Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

No. 26201.

Missouri Court of Appeals,
Southern District,
Division Two.

March 9, 2006.

Ellen H. Flottman, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen.; Dora A. Fichter, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Joan Marschke (Marschke) appeals from an order denying her motion to vacate, set aside or correct judgment or sentence pursuant to Rule 29.15.[1] She alleged that her trial counsel was ineffective in four respects: (1) counsel failed to call a gunshot residue expert to counter testimony from the State's criminalist; (2) counsel failed to call seven witnesses to testify about Marschke's character and personality traits; (3) counsel should not have called Gene Gietzen as a witness to testify about whether the sound of a gunshot could be heard at various locations on Marschke's property; and (4) counsel failed to object to a closing argument comment that was not supported by the evidence. After an evidentiary hearing, the motion court denied relief. We affirm its ruling.

## I. Factual and Procedural Background

Marschke was charged by information with committing the class A felony of murder in the second degree for killing her husband, Carl Marschke (Victim), by shooting him. See § 565.021.[2] This charge was tried to a jury in August 2000. The evidence presented at the trial is summarized below.

At 8:00 p.m. on December 31, 1996, Judy and Martin Stawizynski hosted a New Year's Eve party at their home in Sunrise Beach, Missouri. Marschke and Victim attended the party along with several other couples. The Stawizynskis noted that the Marschkes arrived a few minutes late and Carl stumbled when they walked downstairs into the party. Marschke explained their late arrival by stating that she needed to finish the paperwork from her beauty parlor, Stylarama, before they could leave for the party.

The partygoers noticed that the Marschkes had been drinking. Carol Woodard noticed that the usually "very coifed" Marschke looked "sloppy," and noted that she behaved in an uncharacteristically "talkative and boisterous" manner. During the evening, Victim seemed to be enjoying the party, but Marschke acted as though she wanted to go home. Marschke became very upset after Patricia Garrett told Judy Stawizynski that she was "just like Martha Stewart[.]" Marschke went "on and on" about Martha Stewart to such an extent that Judy Stawizynski changed the subject to subdue Marschke's "out of hand" behavior.

Later, the women challenged the men to a game of Win, Lose, or Draw, but Marschke had trouble comprehending the game's rules. Judy Stawizynski believed that Marschke was intoxicated to the point of being unable to "understand what was going on around her." Martin Stawizynski noted Marschke's slurred speech and glassy eyes, and Patricia Garrett noticed Marschke's agitated, loud and vocal behavior. After the game, Loren Woodard watched as Marschke sat in a chair and stared off into space. During the New Year's Eve toast, Marschke stood off by herself. The Marschkes left the party between 12:15 and 12:30 a.m.

At approximately 1:45 a.m., Chief David Slavens (Chief Slavens) of the Sunrise Beach Police Department and Officer James Robert Walker (Officer Walker) of the Laurie Police Department were dispatched to Stylarama. According to the dispatcher, a shooting had occurred in the residence below Stylarama. They arrived at Stylarama two minutes later. The offi-

---

1. All references to court rules are to Missouri Court Rules (2005).

2. All references to statutes are to RSMo (2000).

cers met Marschke at the door to the residence. Chief Slavens asked Marschke who had been shot, and Marschke replied, "It's my husband and he's in the bedroom." The officers walked back to the bedroom and discovered Victim's body on the bed. He was lying on his left side with his hand covering the side of his face. A bullet appeared to have passed through his hand into his head. Blood was spattered on the wall and on the ceiling, and a drawer in the bedside nightstand contained a box of .44 Remington magnum ammunition.

Throughout the incident, Chief Slavens noticed that Marschke appeared "awfully calm for a lady that just found her husband shot to death" and seemed to be "faking her emotions." Compared to the reactions of people he had observed at other crime scenes, Chief Slavens thought that Marschke's demeanor was unusual. He detected an odor of alcohol about Marschke, but he could not "tell that she was impaired." Chief Slavens went outside and radioed the dispatcher while Officer Walker remained in the living room. Officer Walker noticed a "holster of a large caliber weapon" on the floor in front of a chair.

During the course of the investigation, Marschke asked if they should call an ambulance. Officer Walker replied, "I think it's too late." Marschke sat in a living room chair, cupped her head and looked as though she were sobbing. Chief Slavens noticed, however, that Marschke shed no tears. She also did not express any fear that an intruder might be inside her home.

Shortly thereafter, Deputy Robert Bundick (Deputy Bundick) of the Camden County Sheriff's Department arrived at the scene, and he and Officer Walker secured the residence. Out of the corner of Officer Walker's eye, he saw Marschke move toward the arm of the living room chair. He then turned around and noticed that the holster was gone from its original position in front of the chair. Later, Officer Walker noticed that the holster had been moved to the side of the chair.

Deputy Bundick asked Marschke what had happened that evening, and she replied that she, her husband and several other people had been at "Marty's house." He asked Marschke how she discovered her husband. Marschke replied that, after she went upstairs to the beauty salon to check on some business deposits, she entered the downstairs bedroom, turned on the light and saw spots on her husband. Marschke said that she thought her husband was suffering a stroke. Deputy Bundick asked Marschke if her husband ever contemplated suicide, and Marschke replied, "absolutely not." She then paused for a moment and said, "well he has threatened to commit suicide in the past due to heart problems."

At that point, Deputy Bundick again asked Marschke how she discovered Victim. Marschke stated that she went into the bedroom, walked to his side of the bed, touched his shoulder and said, "Honey, I'm going to bed." It was at that point Marschke claimed she discovered spots on her husband. Deputy Bundick thought that Marschke's variation in the sequence of events was "strange," and he also noticed that Marschke was dressed in street clothes and was not wearing pajamas or a robe.

Meanwhile, Lieutenant Tony Helms (Lieutenant Helms) of the Camden County Sheriff's Department was concerned that an intruder was still present because Marschke said she had been upstairs in Stylarama for about 20 minutes, heard nothing and returned to find her husband shot to death. The officer familiarized himself with the residence and searched for hiding places. He detected no obvious

signs of an altercation, struggle, or forced entry. After Marschke consented to a search of Stylarama, her vehicles and out-buildings, Lieutenant Helms discovered that a person could not gain access to the residence through the upstairs beauty shop, but would have had to exit the shop and subsequently enter through the residence's door. He could tell by the covering of fallen leaves that the sidewalk to Stylarama had not been used recently. As he walked along a makeshift driveway from the residence, Lieutenant Helms saw a bass boat and noticed that the motor cover was "dangling." He approached the back of the boat, flipped over the cover and saw a large caliber, silver weapon lying inside. Paper towels were wrapped around the gun's rubber-like grips, and the gun was loaded.

Subsequently, Deputy Bundick reported Marschke's inconsistent versions of events to Lieutenant Helms. Lieutenant Helms told Deputy Bundick about the gun and advised him to place Marschke under arrest. Lieutenant Helms made another search of the house and found a paper-towel rack with towels that appeared to be the same as those wrapped around the gun. A woman's wristwatch was located next to the towel rack. He also seized the box of .44 magnum shells that were in the nightstand next to Victim's body.

Deputy Phillip Cannon transported Marschke to the Sheriff's Department and administered a gunshot residue test to her hands. Corporal Terri Trokey Harman (Corporal Harman) read Marschke her Miranda rights and was present while Marschke made telephone calls. Harman noticed that Marschke "tried to look like she was crying on the telephone." Corporal Harman was also present as Trooper Rex Scism administered a blood alcohol test on Marschke, which revealed that she had a blood alcohol content of .22 percent.

Dr. Jay Dix (Dr. Dix) performed the autopsy on Victim. Dr. Dix found three wounds on the body from two bullets. One bullet entered the base of the left hand and exited near the wrist. That bullet then entered Victim's head near his right ear and traveled to the left side of the brain. The second bullet entered the top of Victim's right arm and exited near his upper back and neck. At the time of death, Victim's blood alcohol content was .151 percent. Based on the lack of gunpowder residue on Victim's body, Dr. Dix determined that the assailant fired the gun from at least three to four feet away from the body.

Criminalist Kathleen Green (Green) of the Missouri State Highway Patrol analyzed the bullet recovered from Victim's head, a bullet found in the Marschkes' bed, the gun found in the boat and two spent cartridges recovered from the gun. Green testified that the two recovered bullets could have been fired from the gun in question, but damage to the bullets prevented her from making a positive match to the gun. In addition, the gun was dirty and the "rifling was not showing up well on the bullets." She testified that the spent cartridges "were consistent" with the box of ammunition found near the Marschkes' bed. Green also compared the roll of paper towels found at the Marschkes' residence with the paper towels that were wrapped around the gun and determined that the wrapped towels could have come from the roll.

Criminalist Jenny Smith (criminalist Smith) of the Missouri State Highway Patrol tested the gunshot residue swabs that were taken from Marschke's hands. The swabs did not reveal enough barium or antimony to conclusively prove that Marschke fired the gun, but criminalist Smith noted that the swabs were taken after the normal six-hour window for test-

ing had elapsed. She testified that the levels of barium and antimony that were detected were "elevated from what [they] see normally."

Marschke did not testify on her own behalf. Her defense was presented through the testimony of three witnesses: Dawn Eisterholt (Eisterholt); Brian Hoey (Hoey); and Gene Gietzen (Gietzen).

Eisterholt was a former employee of the Missouri State Highway Patrol crime laboratory. She detected no "latent fingerprints of value" on the gun, the bullets, the spent cartridges, the ammunition box or the paper towels. Cold weather, moisture or the fact that a person wore gloves or held material between the person and the object could prevent an examiner from finding fingerprints.

Hoey was a criminalist employed by the Missouri State Highway Patrol crime laboratory. He testified that he did not detect any blood on Marschke's pants.

Gietzen was the owner of a business called Forensics Consultants. He participated in two gun test-firings on the Marschkes' property. During the first test-firing, Gietzen stood in Stylarama while a law enforcement officer fired a gun in the downstairs residence. According to Gietzen, the resulting gunshot sounded like a "thud" rather than a gunshot. During the second test-firing, Gietzen stood in various locations within and outside the Marschkes' residence to determine whether the test shots sounded like gunshots. None of the test-firings that occurred while Gietzen was outside the residence or inside Stylarama sounded like gunshots to him.

In rebuttal, Lieutenant Helms testified that law enforcement conducted the aforementioned test shots because Marschke claimed that she had been upstairs in Stylarama for 20 minutes before she discover-

ed her husband's body and that she had not seen or heard another person during that time period. Lieutenant Helms stated that he stood near Marschke's desk in Stylarama as test shots were fired in the downstairs residence and that he heard a "loud crack" which sounded like a gunshot. He also stated that he felt the test shot's vibrations in Stylarama's floor.

The jury found Marschke guilty of second degree murder, and she was sentenced to 30 years in prison. On direct appeal, this Court affirmed Marschke's conviction. After the issuance of our opinion, the Supreme Court of Missouri granted Marschke's application for transfer. Her conviction was affirmed in an unpublished memorandum opinion. *State v. Marschke*, 75 S.W.3d 286 (Mo. banc 2002).

Thereafter, Marschke filed a timely *pro se* motion to vacate, set aside or correct judgment or sentence pursuant to Rule 29.15. Counsel was appointed, and an amended motion was filed. Her amended motion alleged, *inter alia*, that trial counsel was ineffective in the following respects: (1) counsel failed to present evidence that elevated levels of antimony on Marschke's hands could have resulted from touching Victim, rather than from shooting him; (2) counsel failed to call nine witnesses to testify on Marschke's behalf; (3) counsel should not have called Gietzen to testify; and (4) counsel failed to object and request a mistrial in response to the prosecutor's comment that the murder weapon belonged to Victim because the comment lacked evidentiary support. Following an evidentiary hearing, the motion court denied relief. This appeal followed. Additional facts necessary to our analysis of Marschke's arguments are included below as we address her four points on appeal.

## II. Standard of Review

Marschke bears the burden of proving, by a preponderance of the evidence, that she received ineffective assistance of counsel. Rule 29.15(i). In order to prevail on this claim, she must satisfy a two-prong test: (1) her trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances; and (2) Marschke was thereby prejudiced. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Kates v. State,* 79 S.W.3d 922, 924 (Mo.App.2002). Marschke must satisfy both the performance and prejudice prongs of the *Strickland* test to obtain relief. *State v. Kinder,* 942 S.W.2d 313, 335 (Mo. banc 1996). If she fails to satisfy either prong, we need not consider the other, and her claim must fail. *Neely v. State,* 117 S.W.3d 731, 735 (Mo.App.2003).

Marschke bears a heavy burden in attempting to prove ineffectiveness of counsel under the first *Strickland* prong because there is a strong presumption that counsel provided competent assistance. *Deck v. State,* 68 S.W.3d 418, 425 (Mo. banc 2002). To satisfy the first prong, a movant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. A movant can do this by pinpointing specific acts or omissions of counsel that resulted from unreasonable professional judgment, but the reviewing court must find these acts to be "outside the wide range of professional competent assistance" for the movant to be successful. *Id.* at 690, 104 S.Ct. 2052.

The second prong of the *Strickland* test is met when a movant shows that his attorney's errors affected the judgment. *Id.* at 691, 104 S.Ct. 2052. A movant can prove that the judgment was affected when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. A movant need not show that counsel's deficient conduct more likely than not altered the outcome in the case; it is sufficient to show that there is a reasonable probability a different result would have occurred. *Wolfe v. State,* 96 S.W.3d 90, 93 (Mo. banc 2003).

On appeal, our review of the denial of a Rule 29.15 motion is limited to determining whether the findings and conclusions of the trial court are clearly erroneous. Rule 29.15(k); *Williams v. State,* 168 S.W.3d 433, 439 (Mo. banc 2005). The trial court's findings and conclusions are clearly erroneous "only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made." *State v. Ervin,* 835 S.W.2d 905, 928 (Mo. banc 1992).

## III. Discussion and Decision

Marschke's first point on appeal concerns trial counsel's alleged failure to call an expert witness at trial to testify about the origin of the elevated levels of antimony on Marschke's hands. The following additional facts are pertinent to our discussion of this issue.

As noted above, criminalist Smith testified at the trial about gunshot-residue tests she performed on the swabs taken from Marschke's hands. The purpose of the tests is to detect the presence of barium and antimony on a subject's hands. Both elements are present in the chemical cloud that is created when a gun discharges. Barium and antimony are present in the environment, but they are uncommon. To rule out environmental contamination, the amount of barium or antimony on a test subject's hands must exceed a certain

threshold level in order to reasonably conclude that these elements are present on the subject's hands because he or she fired a gun. The threshold levels for antimony and barium are .020 micrograms per milliliter (m.p.m.) and .250 m.p.m., respectively. Swabs from the subject's hands must be collected within six hours of the incident for the test to be valid.

The swabs on Marschke's hands were taken seven hours after the shooting took place. The test results for antimony on Marschke's hands were: right palm, .032 m.p.m.; right back, .018 m.p.m.; left palm, .023 m.p.m.; and left back .019 m.p.m. The test results for barium on Marschke's hands were: right palm, .178 m.p.m.; right back, .116 m.p.m.; left palm, .073 m.p.m.; and left back .109 m.p.m. Criminalist Smith testified that she could draw no meaningful conclusions from these results because the swabs were collected outside the six-hour window. All she could say was that the levels were "elevated from what we see normally."

On cross-examination, criminalist Smith conceded that none of the barium levels were abnormally elevated. Although some of antimony levels on Marschke's hands were higher than on the hands of non-shooters, criminalist Smith was not able to draw any conclusions from the results because the swabs were not collected quickly enough. She also conceded that some persons who have not fired a gun may have elevated levels of antimony or barium on their hands because they handled objects like metals as a part of their jobs. Criminalist Smith said that testing the materials Marschke used at work could help explain whether her elevated levels were environmental in origin.

In closing argument, Marschke's trial counsel reminded the jury that criminalist Smith was unable to draw any meaningful conclusions from the gunshot-residue test.

The results of her tests were inconclusive because the swabs had not been collected soon enough. He also argued that, in Marschke's job as a beautician, she worked with chemicals, dyes and metal objects that could have caused the elevated antimony levels on her hands.

At the hearing on Marschke's 29.15 motion, the only additional evidence relevant to this issue came from two depositions that were admitted in evidence. The first was a January 2003 deposition of criminalist Smith, whose testimony at Marschke's trial has been summarized above. The second was a November 2003 deposition of forensic chemist Donald Smith (chemist Smith).

In criminalist Smith's deposition, she testified that it was "possible" the levels of barium and antimony found on Marschke's palms were consistent with her touching an object with gunpowder on it. These elements could be transferred from hand to hand by rubbing or touching the hands together. Criminalist Smith was then asked to assume the following facts: (1) Marschke put her hand on Victim's shoulder before she discovered that he was dead; (2) one of the bullets passed through the blanket in the area of Victim's shoulder; and (3) the blanket on top of Victim's shoulder had visible gunpowder on it. Based on these assumptions, she was asked whether this could account for the elevated levels of antimony and barium found on Marschke's hands. Criminalist Smith was not able to answer the question because it involved too many variables. She did not know how close the shooting distance was or whether there really was soot and gunpowder on the blanket. She pointed out that, in order to produce visible soot, the gun would have to have been fired within six inches of the blanket. Moreover, the sooty substance created by such close range discharges is vaporous

lead from the bullet. There would not be any gunpowder or lead deposits on a target from a handgun fired more than three and one-half feet away. She also noted that neither the blanket nor the Victim's clothing were submitted to her for testing to see whether there was gunpowder residue on them. Finally, she was not aware of any studies or tests that had been done to show how easily antimony could be transferred to someone's hands simply by touching an object penetrated by a bullet.

In chemist Smith's deposition, he testified that freshly-deposited gunshot residue on an object can be transferred to a person's hand by touching the object. The residue can then be transferred from one hand to the other by rubbing or touching the hands together. When asked to assume that a coroner had seen visible gunpowder on the blanket covering Victim when he was shot, chemist Smith gave the following response:

> If, in fact—I don't know the degree of certainty that one has about looking at gun—at dust or something if it's gunshot residue without doing some type of chemical testing. I don't know that I could visually describe the gunshot residue by that method, and I don't know what they did, but if there was gun residue loose on it that they saw, there's going to be lots of activity in tight weave and you're going to be transferring; you're going to get lost.

Assuming there was gunshot residue on the blanket, chemist Smith testified it was "highly probable" that Marschke would have gotten residue on her hand by touching Victim's shoulder.

The motion court found that trial counsel's actions in pointing out the inconclusive nature of the test results in cross-examination and argument constituted reasonable trial strategy and that calling an expert would have simply highlighted the

issue. The motion court also found that Marschke was not prejudiced by counsel's strategic decision not to call an expert.

■■■ It is settled law that trial strategy decisions are virtually unchallengeable and rarely furnish a ground for finding ineffective assistance of counsel. *Storey v. State*, 175 S.W.3d 116, 125 (Mo. banc 2005); *Middleton v. State*, 103 S.W.3d 726, 736–37 (Mo. banc 2003); *see also State v. Chambers*, 891 S.W.2d 93, 109–10 (Mo. banc 1994). This includes trial counsel's strategic decisions concerning the selection of the witnesses and evidence that will be presented on a defendant's behalf. *Williams v. State*, 168 S.W.3d 433, 443 (Mo. banc 2005); *Leisure v. State*, 828 S.W.2d 872, 875 (Mo. banc 1992). To prevail on a claim that counsel was ineffective in failing to call a witness, the movant must show that the witness's testimony would have produced a viable defense. *Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005).

■■■ On appeal, Marschke contends the motion court's findings are clearly erroneous because trial counsel should have called an expert to testify that the elevated levels of antimony on Marschke's hands probably resulted from touching Victim's shoulder, rather than from shooting him. Marschke claims such expert testimony was crucial because: (1) it would have supported Marschke's theory of defense that Victim was shot by some unknown intruder while Marschke was in Stylarama; and (2) it would have impeached the State's expert witness, criminalist Smith. The trial court concluded otherwise, and its conclusion is not clearly erroneous.

■■■ It is axiomatic that the facts on which an expert's opinion is based must have a substantial basis in established facts and cannot rest on mere conjecture, speculation or assumed facts. *Moheet v.*

*State Bd. of Registration for Healing Arts,* 154 S.W.3d 393, 402 (Mo.App.2004). "[W]hen an expert is asked to assume certain facts as true in order to answer a hypothetical question, those facts must be established by the evidence." *State v. Reynolds,* 997 S.W.2d 528, 531 (Mo.App. 1999). In the case at bar, criminalist Smith and chemist Smith were each asked a hypothetical question which assumed the coroner had seen visible gunpowder on the blanket in the area of Victim's shoulder. Criminalist Smith was not able to say whether touching the blanket would have transferred antimony to Marschke's hand because there were too many variables to consider. Chemist Smith did answer the same question, but only after expressing the concern that it would be difficult for the coroner to visually identify a substance on the blanket as gunshot residue in the absence of confirmatory chemical tests. We have reviewed the transcript of the evidentiary hearing on Marschke's Rule 29.15 motion, and it contains no testimony from the coroner concerning his observations at the scene. Accordingly, there was no evidence before the motion court that the coroner actually saw anything on Victim's blanket. In addition, criminalist Smith verified in her post-trial deposition that Victim's blanket had never been tested to see whether there was any gunshot residue on it. Finally, it is undisputed that Dr. Dix looked for gunshot residue on Victim during the autopsy and found none. There was simply no evidence before the motion court that proved there was any gunshot residue on Victim or his blanket.

If Marschke's counsel had called chemist Smith as an expert at the trial, there is no reasonable probability that his testimony would have led to a different verdict. Chemist Smith's opinion rested on the essential factual assumption that there was gunshot residue on Victim or his blanket which would have been transferred to Marschke's hand when she touched Victim's shoulder. Because Smith's opinion lacked any substantial basis in facts established by the evidence, his testimony had no probative value and neither supported Marschke's theory of defense nor contradicted criminalist Smith's trial testimony. If Marschke's counsel had asked criminalist Smith about this "transfer" theory at trial, her post-trial deposition testimony illustrates how unproductive that line of questioning would have been for the defense. The inconclusive nature of the testimony that criminalist Smith did give at trial was demonstrated quite well by Marschke's counsel in cross-examination and closing argument, as the motion court pointed out. For all of these reasons, we agree with the trial court that Marschke was not prejudiced by trial counsel's failure to call an expert witness to testify about the gunshot-residue tests. Accordingly, Point I is denied.

Marschke's second point on appeal concerns trial counsel's alleged failure to call seven witnesses to testify about Marschke's character and personality traits, despite promising in opening statement to do so. The following additional facts are pertinent to our discussion of this issue.

During opening statement, Marschke's trial counsel told the jury that there would be evidence from various people who knew Marschke concerning her character, good-natured personality, honesty and disdain for violent acts. At that time, counsel believed he might try to inject a character defense into the case. During the State's case-in-chief, however, defense counsel elicited testimony from several witnesses during cross-examination concerning their knowledge of Marschke's past behavior. Chief Slavens testified that, during the ten years he had been a Sunrise Beach police officer, he had never heard of any threats made against anyone by Marschke. Judy

Stawiznyski testified that she had known Marschke for quite a while. Stawiznyski had never observed Marschke become violent or known her to shoot a gun. Moreover when the witness's husband went outside at midnight to fire off a gun, Marschke remained inside and repeatedly expressed concern about how the Stawiznyskis' dog would respond to the sound of gunfire. Patricia Garrett testified that Marschke got real vocal and loud when she had been drinking, but she never threatened anyone or became violent. As the trial progressed, defense counsel consulted with Marschke, and they jointly concluded the State had presented such a weak case that it was unnecessary for Marschke to call any character witnesses to testify on her behalf. Therefore, counsel made the strategic decision not to do so. In closing argument, counsel explained his decision to the jury in the following way:

> [B]efore the State can brand this woman a murderer, before they can do that they had to prove beyond a reasonable doubt that to each of you. The defense doesn't have to prove a thing. And I know it's been a while back that you all said you would do that, back in jury selection on Monday, that you would meet the State's burden of proof and you would not expect the defense to meet any burden because that's how our system works. At this point, as the judge told you, there's no more evidence the State can put on to change your mind right now so if there is reasonable doubt in your mind in this case then there's nothing the State can do evidentiary-wise to change that. Now I know that [the prosecutor] will probably tell you when he talks to you again that I promised some things that we would show back in my opening statement, and where is that now, why didn't we show that, well I'll tell you, that after hearing the State's

case we did not have to put on all that. . . . [T]he burden is not on us, it's on the State, and their lack of evidence dictated what we did. Now I do apologize for telling you some things in the beginning that we didn't tell you about, but you've been here long enough and you've heard the evidence. Is there a reasonable doubt in this case? That's the standard.

In the State's rebuttal argument, the prosecutor made no comments concerning Marschke's decision not to call any character witnesses to testify on her behalf.

At the evidentiary hearing on Marschke's 29.15 motion, the court admitted affidavits or depositions from Cheri Gaw, Lisa Edwards, Stephanie Sherman, Larry Graham, Dan Gaw, Kerry Manning and Wes Gibson. If called at trial, these witnesses would have testified that: (1) Marschke had a reputation for honesty in the community; (2) they had not personally witnessed acts of violence by Marschke in the past; (3) she did not tend to show emotion in crises; and (4) she did not like guns. The motion court denied relief. The judge concluded that counsel's strategic decision not to call these witnesses was reasonable, and counsel explained in closing argument why these witnesses did not testify. Furthermore, the court found Marschke was not prejudiced by counsel's decision because the testimony from these witnesses was not credible or persuasive, and there was no reasonable probability the result would have been different if these witnesses had testified. Marschke contends the court's conclusions are clearly erroneous.

 Marschke's first argument is that the testimony of these witnesses would have "presented a clear picture that she was not the sort of person to commit such a violent offense." Thus, the salient issue

is whether testimony of these witnesses would have furnished Marschke with a viable defense to the charge of murder. *Worthington v. State,* 166 S.W.3d 566, 577 (Mo. banc 2005). A defendant is generally allowed to put on evidence of his good character concerning the character traits inherent in the crime charged. *Kuehne v. State,* 107 S.W.3d 285, 297 (Mo.App.2003). Such evidence is relevant to show the improbability that the defendant committed the charged crime and as substantive proof of innocence. *State v. Guidorzi,* 895 S.W.2d 225, 230 (Mo.App.1995). Evidence of general good character that is not restricted to the traits of character involved in the crime, however, is not admissible. *State v. Goodwin,* 65 S.W.3d 17, 23 (Mo. App.2001). In addition, evidence concerning a defendant's character may only be shown by testimony as to his reputation, rather than by evidence of his specific acts or conduct. *State v. Graham,* 906 S.W.2d 771, 780 (Mo.App.1995). In a murder case, evidence of the defendant's good reputation as a peaceable and law-abiding citizen is the only capacity in which reputation evidence is admissible as a defense to that charge. *See State v. Hayes,* 295 S.W. 791, 793 (Mo.1927).

▬▬▬ The record before the motion court contains no testimony from any of the aforementioned witnesses concerning Marschke's reputation in the community as a peaceable and law-abiding citizen. Instead, they were prepared to testify about Marschke's reputation for honesty. If such testimony had been offered at trial, it would have been irrelevant and inadmissible because dishonesty is not a character trait inherent in the crime of murder. *See State v. Martinelli,* 972 S.W.2d 424, 434–35 (Mo.App.1998) (up-

holding the exclusion of evidence as to defendant's reputation for truthfulness and honesty because those traits were not relevant to the commission of murder). In the case at bar, there was no evidence before the motion court that any of the witnesses would have testified about Marschke's reputation in the community as a peaceable and law-abiding citizen. Similarly, testimony from these witnesses that they had not observed Marschke behave violently or use firearms in the past would have been irrelevant and inadmissible because it concerned specific acts or conduct by Marschke, rather than her reputation in the community for being peaceable or law-abiding. *See Goodwin,* 65 S.W.3d at 23–24 (witness's personal opinion of defendant's honesty, based on what the witness had seen and not on defendant's general reputation, was immaterial and inadmissible); *Graham,* 906 S.W.2d at 780. Trial counsel cannot be found ineffective for failing to offer inadmissible evidence. *Williams v. State,* 168 S.W.3d 433, 441 (Mo. banc 2005); *Neely v. State,* 117 S.W.3d 731, 736 (Mo.App.2003). In any event, defense counsel did elicit testimony concerning Marschke's nonviolent nature and dislike of guns during the cross-examination of Chief Slavens, Judy Stawiznyski and Patricia Garrett.[3] Further evidence on the same issue would have been cumulative. "Counsel will not be found ineffective for deciding not to introduce cumulative evidence." *Williams,* 168 S.W.3d at 441.

▬▬▬ That leaves only the witnesses' testimony about Marschke's emotional demeanor to consider. Marschke argues that her counsel should have presented testimony that she did not show her emo-

---

**3.** In addition, during the prosecutor's direct examination of Deputy Bundick he testified that he asked Marschke at the crime scene if

she had ever previously fired a gun. She replied that she had done so "maybe one time."

tions in crises to rebut "the [State's] damaging testimony that Ms. Marschke was cold and unfeeling...." This argument fails because the motion court specifically found such testimony would have been neither credible nor persuasive. On appeal, we defer to that credibility determination. *State v. Simmons*, 955 S.W.2d 752, 773 (Mo. banc 1997); *Bell v. State*, 119 S.W.3d 607, 610 (Mo.App.2003). The motion court did not clearly err in concluding that Marschke was not prejudiced by trial counsel's strategic decision not to call seven character witnesses at trial. *See State v. Harris*, 854 S.W.2d 853, 857 (Mo.App. 1993). Point II is denied.

■ In Point III, Marschke contends trial counsel should not have called Gietzen as a witness to testify about the tests he performed to determine whether a person in Stylarama, which was located above the Marschkes' living quarters and was not directly accessible from there, could hear a gunshot in Victim's bedroom. Marschke contends counsel was ineffective for calling Gietsen because doing so opened the door for the State to call Lieutenant Helms as a rebuttal witness to contradict Gietzen's testimony.

During the State's case-in-chief, the jury was presented with evidence that Victim had been shot twice with a .44 magnum revolver. The bullet impacts were so powerful that blood was splattered on the wall and ceiling of Victim's bedroom. The physical layout of the beauty shop, the downstairs living quarters and the way in which they were connected to one another was before the jury. In addition, they heard testimony that Marschke told officers she had been in Stylarama for 20 minutes working on business deposits, heard nothing, and returned to find her husband shot to death.

At the evidentiary hearing on the post-conviction motion, Marschke's counsel testified that the State's evidence raised the issue of whether Marschke could have heard the gunshots in Stylarama. Counsel made the strategic decision that this issue had to be addressed by the defense. Gietzen was called to defuse the issue as much as possible, and his testimony did tend to support Marschke's statements to police that she did not hear the shots fired in Victim's bedroom. The motion court concluded that calling Gietzen as a witness was a reasonable strategy, and Marschke was not prejudiced by the decision.

We do not find the motion court's conclusion to be clearly erroneous. Decisions concerning what witnesses to call and what specific evidence to present are matters of trial strategy. *Kates v. State*, 79 S.W.3d 922, 926 (Mo.App.2002); *Payne v. State*, 21 S.W.3d 843, 845 (Mo.App.1999). The facts presented during the State's case-in-chief were sufficient to raise a serious question about the credibility of Marschke's statement to officers that, while she was in Stylarama, she did not hear the two shots that were fired from a .44 magnum revolver in Victim's bedroom. Thus, the issue of whether her statement could be true was still present even though the State opted not to ask Lieutenant Helms about gunshot sound tests during the State's case-in-chief. Gietzen's testimony assisted the defense by presenting the jury with evidence to support the inference that Marschke's statement to police was believable. We reject Marschke's argument that this reasonable trial strategy was ineffective simply because it permitted the State to call Lieutenant Helms in rebuttal to contradict Gietzen's testimony. Lieutenant Helm's testimony simply supported the inference Marschke could have heard the gunshots which killed her husband. The jury could have drawn the same inference from the evidence presented during the State's case-in-chief. Point III is denied.

■ Marschke's fourth point concerns counsel's failure to object to comments by the prosecutor during cross-examination and closing argument that were not supported by the evidence. The following additional facts are relevant to our discussion of this issue. During the cross-examination of fingerprint expert Eisterholdt, the prosecutor asked several questions which assumed that the .44 magnum revolver found at the scene was owned by Victim. The witness verified that Victim's fingerprints had not been found on the weapon. During the State's closing argument, the prosecutor told the jury that "we know that the defendant killed her husband by shooting him with his own gun that was found right outside the house, that he kept in their nightstand in their bedroom, next to their bed." Because Marschke's counsel mistakenly thought there was evidence proving the weapon had been taken from the nightstand drawer, he did not object to the prosecutor's cross-examination questions or closing argument comment.

■ The motion court denied this claim because there was no reasonable probability that the outcome of the trial would have been different if counsel had objected. On appeal, Marschke claims the court's conclusion is clearly erroneous. "The mere failure to object does not constitute ineffective assistance of counsel." *State v. Lumpkin*, 850 S.W.2d 388, 395 (Mo.App.1993). Counsel is not necessarily incompetent for failing to make a meritorious objection. *Shockley v. State*, 147 S.W.3d 189, 194 (Mo.App.2004). "The failure to object constitutes ineffective assistance of counsel only where the comment was of such a character that it resulted in a substantial deprivation of the accused's right to a fair trial." *State v. Taylor*, 831 S.W.2d 266, 272 (Mo.App.1992); *State v. Link*, 965 S.W.2d 906, 912 (Mo.App.1998).

The trial court concluded, and we agree, that counsel's failure to object did not result in a substantial deprivation of Marschke's right to a fair trial.

The jury was presented with the following evidence. When officers arrived at the scene, they found Victim dead from multiple gunshot wounds. A box of Remington .44 magnum ammunition was found in the nightstand drawer next to Victim's bed. Officer Walker noticed the holster for a large caliber weapon on the living room floor in front of a chair. After Marschke moved toward the chair, the holster disappeared from its original position. Officer Walker later noticed the holster had been moved to the side of the chair. Lieutenant Helms searched the residence and detected no obvious signs of an altercation, struggle or forced entry. He found a large caliber, silver weapon lying inside a bass boat outside the house. Paper towels were wrapped around the gun's grips, and the gun was loaded. Two empty cartridge casings were found in the cylinder. He searched the house again and found a paper-towel rack with towels that appeared to be the same as those wrapped around the gun. A woman's wristwatch was discovered next to the towel rack. Criminalist Green analyzed the two spent cartridges recovered from the gun. She testified that the cartridges "were consistent" with the box of ammunition found near Victim's bed. Green also compared the roll of paper towels found in the Marschkes' residence with the paper towels that were wrapped around the gun. Green determined that the wrapped towels could have come from the roll.

Based on this evidence, the jury could have inferred that the Marschkes possessed a .44 caliber weapon and that Marschke used this weapon to kill her husband. It was not important whether Victim actually owned the gun or kept it in

the nightstand drawer. We find no merit in Marschke's argument that counsel's failure to object allowed the State to avoid "calling [Victim's sons] Mark and Matthew Marschke as witnesses to establish that it was their father's gun, since they had made themselves look like suspects in the first trial."[4] The prosecutor could have proven who owned the gun without calling Victim's children as witnesses. At the post-conviction hearing, the court admitted affidavits from Larry Graham and Dan Gaw in evidence. Both witnesses verified that the murder weapon was, in fact, owned by Victim. Point IV is denied.

After a thorough review of the record, we do not have a definite and firm impression that the motion court made a mistake in denying Marschke's request for post-conviction relief. Therefore, the motion court's findings of fact and conclusions of law are not clearly erroneous. *See* Rule 29.15(k). The order denying Marschke's amended Rule 29.15 motion is affirmed.

SHRUM, P.J., and BARNEY, J., Concur.

---

**4.** Marschke's first trial on this same charge ended in a hung jury. On retrial, she was convicted.